IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 98-30318
Summary Calendar
_____

DELENE GRIFFIN; LORI TERREBONNE; BUFFY PLAISANCE,

      Plaintiffs-Appellees,

v.

DELCHAMPS, INC.,

      Defendant-Appellant.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
(96-CV-233-S)
_____

March 12, 1999

Before KING, Chief Judge, BARKSDALE and STEWART, Circuit Judges.

KING, Chief Judge:[*]

    Defendant-appellant Delchamps, Inc. appeals from the district court judgment entered after the jury returned an adverse verdict in this lawsuit brought pursuant to Title VII, 42 U.S.C. §§ 2000e to 2000e-17. We affirm in part and reverse in part the judgment of the district court, and remand to the district court for entry of an amended judgment.

---

[*]Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1

# I. BACKGROUND AND PROCEDURAL HISTORY

Plaintiffs-appellees Delene Griffin, Lori Terrebonne, and Buffy Plaisance (B. Plaisance)(collectively, plaintiffs), former employees of defendant-appellant Delchamps, Inc. (Delchamps), filed suit on January 18, 1996, alleging the existence of a hostile work environment based on sex, constructive discharge, and intentional infliction of emotional distress. The district court conducted a jury trial from May 19, 1997 to May 21, 1997. After the district court denied Delchamps's motion for judgment as a matter of law made at the close of plaintiffs' case and re-urged at the close of evidence, the jury returned a verdict in favor of plaintiffs, awarding them back pay, front pay, compensatory damages, and punitive damages. On November 12, 1997, the district court issued a judgment modifying the monetary awards, which was made final by the district court's March 13, 1998 denial in part of plaintiffs' motion to amend the judgment.[1] Delchamps filed a timely notice of appeal on March 31, 1998.

The facts pertinent to this appeal are as follows:

Plaintiffs all were employed by Delchamps in Cut Off,

---

[1] The ultimate damage awards were as follows: Griffin--$9200 in back pay, $2690 in front pay, $35,000 in compensatory damages, $40,000 in punitive damages, and $15,000 for intentional infliction of emotional distress; Terrebonne--$3400 in back pay, $1506 in front pay, $15,000 in compensatory damages, $58,400 in punitive damages, and $30,000 for intentional infliction of emotional distress; and B. Plaisance--$9200 in back pay, $112 in front pay, $25,000 in compensatory damages, $40,000 in punitive damages, and $15,000 for intentional infliction of emotional distress.

Louisiana, until their resignations in July 1995.[2]  During their

tenures with Delchamps, Griffin and B. Plaisance worked as

cashiers, dairy clerks, and frozen food clerks.  Terrebonne

worked as a produce clerk.  All three contend that from mid-1994

until the time of their resignations in mid-1995, a hostile work

environment based on their sex existed, which led ultimately to

their constructive discharge.

During the relevant time period, Allen Berthelot served as

store manager, Kelly Kirchhoff and Earl Hebert served as

assistant managers, Kerry Plaisance (K. Plaisance) was the head

stock clerk,[3] and Tony Leger was the meat market manager.

Plaintiffs testified at trial that, during their employment,

male employees engaged in "chrome shots," meaning they would use

the polished mirrors underneath the refrigerator cases to look up

women's skirts and shorts.  According to Griffin, the chrome

shots began as early as 1993, and increased in frequency in 1994

to a regular weekly basis, with more and more male employees

participating as time went on.  Among other male employees,

plaintiffs observed store manager Berthelot, K. Plaisance, and

Leger engage in chrome shots.

Plaintiffs also testified that they observed male employees,

---

[2]  Griffin had been employed at Delchamps's Cut Off, Louisiana store since 1982, and Terrebonne had been employed there since 1990.  B. Plaisance began employment with Delchamps in 1987 at a different location, and transferred to the Cut Off, Louisiana store in 1991.

[3]  K. Plaisance and plaintiff-appellee B. Plaisance are not related.

3

including Berthelot, K. Plaisance, and Leger, pass around women's magazines. On one occasion, Berthelot showed Griffin a magazine containing pictures of women's breasts, and later showed the same pictures to a truck driver in her presence. Terrebonne testified that K. Plaisance showed her a magazine containing pictures of women's breasts, and that she overheard Berthelot discuss a magazine depicting homosexual men. B. Plaisance testified that, in 1995, she began to walk abruptly away from store manager Berthelot when he showed her magazines with sexual pictures such as women's bare breasts. On one such occasion, Berthelot pulled her aside and asked her whether she had a "problem." She responded that she believed the workplace should be a more professional environment and that personal matters should be left at home. Berthelot responded that she had an "attitude problem." When B. Plaisance asked what Berthelot wanted from her, he told her he wanted her to laugh at their jokes and "have fun with it." She replied that she would not, and he again told her that she had an attitude problem. B. Plaisance testified that she felt Berthelot was threatening her job by stating that she had an attitude problem.

Plaintiffs further testified that they witnessed male Delchamps employees, including Berthelot, K. Plaisance, and Leger, follow female customers around the store. Griffin testified that Berthelot, the store manager, would call other male employees on the store's market phone to inform them that an attractive woman was entering the store, or he would ask them to

4

meet in a certain aisle over the public address system, at which point they would follow the customer around. Plaintiffs testified that they overheard male employees guessing the color of female customers' underwear or whether they were wearing bras. Griffin stated that she overheard the men comment on the appearances of female customers, including a remark by Leger about a woman's breasts--"Wouldn't you like to smother in that?" B. Plaisance testified that this behavior occurred once or twice a week in 1994, and continued in 1995. Terrebonne witnessed this behavior approximately once a week in 1994, and almost every day in 1995. According to Griffin, the men also played a game they called "the stock game," in which the men would state whether they would be willing to "do" a particular customer.

Griffin and B. Plaisance testified about an occasion on which Griffin overheard Berthelot and K. Plaisance discuss B. Plaisance's breasts when she entered the store on her day off. B. Plaisance stated that she wore a short-sleeved ribbed, fitted shirt, and that K. Plaisance and Berthelot had stared at her chest, making her feel very uncomfortable. According to Griffin, K. Plaisance remarked that he had not realized that B. Plaisance was so "stacked," and Berthelot nodded in agreement.

All three plaintiffs testified that they overheard male employees, including K. Plaisance, Berthelot, and John Lirette, discuss videotapes with lurid sexual content. Specifically, one videotape featured sexual acts between women and animals. Plaintiffs overheard male employees discuss a scene from the

5

videotape in which a woman had sex with a horse.[4]  Terrebonne also overheard Berthelot and K. Plaisance discuss another videotape in which, during a skit, a naked woman ran around a stage.

All three plaintiffs further testified that K. Plaisance frequently used offensive language including "fuck" and "bitch," and that his language worsened during 1995.  Griffin testified about an occasion on which K. Plaisance informed her that he had received a "blow job" from his wife through the window of his new pick-up truck, and that it was the best "blow job" he had ever received.  Terrebonne also testified that K. Plaisance told her that his wife gave him a "blow job" through the back window of his new truck to "bless" it.

On another occasion, K. Plaisance questioned Griffin across the sales floor from twenty feet away as to whether she gave her husband "blow jobs."  Griffin was offended by his question, and told him not to speak to her that way.  K. Plaisance replied that he was going to ask her husband whether she gave him "blow jobs." Griffin walked away.

B. Plaisance testified that K. Plaisance would frequently remark that he would like to have sexual relations with particular female customers.  According to her testimony, K. Plaisance's language became worse in 1995.  She testified that he

---

[4]  According to Terrebonne, she also overheard Lirette say, "there was this woman that was fucking a goat," and overheard K. Plaisance say, "there was this woman that was fucking a dog," and "she was sucking the dog's dick, and then the dog was licking her pussy."

once asked her if she "shaved [her] pussy."  When she replied that it was none of his business, he laughed and said "You know you like it."  She further testified that, in 1995, K. Plaisance asked her if she would "fuck" him, to which she responded that she did not want him to talk to her that way.

Terrebonne testified that twice a week K. Plaisance would describe an affair he was having with a married woman, stating that she gave good "blow jobs" and that he would like to "fuck" her again.  According to Terrebonne, he also described an occasion on which he had taken a woman to a bowling alley, tried to "fuck her," but because she was "too dry" she gave him a "blow job" instead.

Terrebonne further testified that K. Plaisance frequently made vulgar comments to her about customers, such as "Oh, I'm going to come on her," or "I bet her pussy stinks."  Terrebonne testified that, by 1995, K. Plaisance was directing offensive comments to her every day.  For example, she testified that every day he would say to her, "When are you going to let me fuck you? I just want to fuck you once, maybe twice," almost every day he would tell her that he wanted to "come" on her, about three times a week he would grab his crotch and tell Terrebonne to "suck this," every day he would ask her, while she was working in the cooler, if her nipples were hard, and once he asked her if she was wearing underwear.  According to Terrebonne, K. Plaisance ignored her repeated requests to leave her alone.

In addition to the vulgar language, B. Plaisance testified

about an occasion on which assistant manager Kirchhoff walked into the women's restroom after she had passed him on her way into the restroom. She was standing outside the stall with her shirt tucked under her chin, trying to zip her pants, when Kirchhoff walked in. Both her bra and her underwear were exposed. Kirchhoff stood and stared, and B. Plaisance became upset and ran out of the restroom. She reported the incident to assistant manager Hebert, who did not respond, and to store manager Berthelot, who rolled his eyes and walked away.

Terrebonne testified concerning three occasions on which K. Plaisance fondled her bottom. The first incident occurred in January 1995 when K. Plaisance brushed past her and rubbed his hand on her bottom. Terrebonne turned around, hit him, and told him not to do it again. He then tried to do it again, and said, "Oooh, that felt good, I'm going to do it again." She again told him to leave her alone, and was upset by the incident. The next incident occurred in early May 1995. K. Plaisance passed Terrebonne in an aisle and pinched her on the bottom. She told him not to do it again, and he made a motion toward her breast as though he were going to touch it. She again told him to leave her alone, at which point he knelt down on a case of merchandise, scooted it over in front of her, and said, "Well, I'm going to accidentally touch your breast." Terrebonne then walked away. The final incident occurred in late May 1995. K. Plaisance approached Terrebonne from behind and grabbed her bottom with both hands as she drank from a water fountain. She told him to

8

stop, and he said, "Come on, you know you like it." This incident caused Terrebonne to cry. She later told B. Plaisance about the incident after B. Plaisance witnessed her crying.[5]

Plaintiffs made several complaints to their supervisors about the behavior occurring at the store. At the end of 1994 or the beginning of 1995, B. Plaisance told assistant manager Hebert that she was offended by the chrome shots and by male employees following around female customers. She testified that Hebert did not say much in response, but did not seem surprised. As discussed above, B. Plaisance also testified that she informed Hebert about the incident in which assistant manager Kirchhoff walked into the women's restroom while she was partially undressed, but that Hebert did not respond. She then informed Berthelot of the incident, but he responded by rolling his eyes and walking away, and seemed upset with her after she reported it.

In June 1995, plaintiffs and another female Delchamps employee requested a meeting with Berthelot to discuss the working conditions at the store. At the meeting, B. Plaisance told Berthelot that she was offended by K. Plaisance's vulgarity and informed him of one of the incidents in which K. Plaisance

---

[5] B. Plaisance testified that she witnessed K. Plaisance come out of the back of the store, laughing with another male employee. K. Plaisance then asked her, "What would you do if I would grab you on the ass?" She responded, "I would hit you." He replied, "Yeah, I thought so." At this point, she went into the back of the store and observed Terrebonne crying. She testified that Terrebonne later told her that K. Plaisance had grabbed Terrebonne's bottom.

had touched Terrebonne's bottom. Berthelot's responded by pretending he was playing the violin--a gesture that signaled to B. Plaisance that he thought they were "just a bunch of women up there whining." At that point, Berthelot left the meeting. When he returned a few minutes later, he began to talk about scheduling, an issue that the women had not raised during the meeting. B. Plaisance attempted to return the discussion to the inappropriate behavior occurring at the store, but Berthelot merely continued discussing scheduling. The entire meeting lasted ten or fifteen minutes. Conditions at the store did not improve after the meeting. In fact, B. Plaisance testified that the offensive behavior continued, and that male employees began to treat the women with hostility. For example, she testified that Berthelot became very abrupt with her, jerked papers out of her hands, and gave her fewer breaks.

At the end of June 1995, Griffin asked Berthelot to call Johnny Smith, the area supervisor, to come in for a meeting. Smith came to the store that afternoon and met separately with Griffin, B. Plaisance, and Terrebonne. Berthelot was present at each meeting. During Griffin's meeting, she complained to Smith about K. Plaisance's vulgarity. She testified that Berthelot tried to interrupt her during the meeting, and that she felt uncomfortable having him there. She further testified that conditions did not improve after the meeting and that the

hostility grew worse.[6]

During B. Plaisance's meeting, she informed Smith about K. Plaisance's vulgar language, about the episode where K. Plaisance had grabbed Terrebonne's bottom, and about a question that she had heard that Berthelot had asked K. Plaisance--"was he getting any from [Terrebonne]?" She testified that Smith turned to Berthelot and asked whether that was true. Berthelot denied it, and Smith appeared to take his denial at face value. B. Plaisance testified that she felt uncomfortable having Berthelot at the meeting because she felt he was part of the problem and because she feared retaliation. According to her, conditions worsened after the meeting.

During Terrebonne's meeting, she told Smith about the times that K. Plaisance had touched her without permission and about K. Plaisance's vulgarity. Terrebonne testified that she felt uncomfortable with Berthelot's presence at the meeting and that she felt she could not tell Smith everything she wanted to because Berthelot was there. She testified that, after the meeting, the behavior and the hostility continued. For example, she testified about an incident in which Leger, appearing very upset, came "flying toward" her with a meat cart. The meat cart hit the buggy she was using, which hit her. She was very upset

---

[6] Later, near the end of Griffin's employment, she also complained to Smith about K. Plaisance's question to her regarding whether she gave her husband "blow jobs."

11

by the incident because she felt Leger was trying to hurt her.[7] Smith later issued K. Plaisance a written reprimand, which stated that off-color jokes and innuendos giving the appearance of sexual harassment would not be tolerated.

All three employees resigned their positions in July 1995, and went to work at a new Wal-Mart superstore opening in the area.

On appeal, Delchamps argues that the evidence was insufficient to support the jury's verdict because plaintiffs did not prove the existence of a hostile work environment based on sex, that the evidence did not establish that Delchamps is legally responsible for any hostile work environment that may have existed, that plaintiffs did not prove constructive discharge, that plaintiffs did not prove intentional infliction of emotional distress, that certain damage awards were inappropriate, that the district court erroneously instructed the jury, and that the district court erred by admitting certain testimony. We examine each contention in turn.

## II.  STANDARD OF REVIEW

This court must consider the evidence in the light most favorable to the prevailing party below, drawing all reasonable inferences in favor of the jury's verdict. See Weller v. Citation Oil & Gas Corp., 84 F.3d 191, 194 (5th Cir. 1996);

---

[7]  She later complained to Smith about Leger's behavior. He appeared unconvinced by her story.  She testified that she said to Smith, "You look at me like you don't believe me," to which he replied, "I believe you to be a truthful person."

12

Boeing Co. v. Shipman, 411 F.2d 365, 374 (5th Cir. 1969). We may reverse only "if reasonable minds exercising impartial judgment could not have arrived at the verdict." Weller, 84 F.3d at 194.

### III. DISCUSSION

#### A. Existence of Hostile Work Environment

In order to establish a hostile work environment sexual harassment claim, plaintiffs are required to show (1) that they belong to a protected class; (2) that they were subject to unwelcome sexual harassment; (3) that the harassment was based on sex; (4) that the harassment affected a term, condition, or privilege of employment (i.e., that the harassment was so severe or pervasive as to alter the conditions of employment and create an abusive working environment); and (5) that the employer knew or should have known of the harassment and failed to take prompt remedial action. See Farpella-Crosby v. Horizon Health Care, 97 F.3d 803, 806 (5th Cir. 1996); Jones v. Flagship Int'l, 793 F.2d 714, 719-20 (5th Cir. 1986). Delchamps challenges the sufficiency of the evidence to support the jury's verdict on the fourth and fifth elements.[8]

Delchamps first argues that the harassment was not sufficiently severe or pervasive. Sexual harassment that is so severe or pervasive that it alters the conditions of employment and creates an abusive working environment violates Title VII. See Faragher v. City of Boca Raton, 118 S. Ct. 2275, 2283 (1998);

---

[8] We discuss employer liability (the fifth element) in section III.B below.

13

<u>Meritor Sav. Bank, FSB v. Vinson</u>, 477 U.S. 57, 67 (1986).  To be actionable, the environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."  <u>Faragher</u>, 118 S. Ct. at 2283 (citing <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21-22 (1993)).  It is necessary to consider "'all the circumstances'" in order to determine whether an environment is sufficiently hostile or abusive, including the "'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  <u>Id.</u> (quoting <u>Harris</u>, 510 U.S. at 23)).

We have no trouble concluding from the testimony described above that the evidence was more than sufficient to support the jury's determination that plaintiffs were subjected to severe or pervasive harassment at Delchamps.  The <u>Harris</u> factors are all present.  First, the harassment occurred frequently.  All three plaintiffs testified to daily comments and vulgarity, including Terrebonne's testimony that K. Plaisance would say to her on a daily basis that he wanted to "come" on her and that he wanted to "fuck" her, and her testimony that he would ask her on a daily basis whether her nipples were hard.  All three plaintiffs also testified that male employees frequently followed females around the store and engaged in "chrome shots" several times per week.  Second, much of the harassment is severe, including K. Plaisance

14

grabbing his crotch three times per week and telling Terrebonne to "suck this," K. Plaisance telling Terrebonne daily that he wanted to "come" on her and wanted to "fuck" her, K. Plaisance asking daily whether Terrebonne's nipples were hard, K. Plaisance's frequent discussions of oral sex in front of all three plaintiffs, K. Plaisance shouting across the sales floor to ask Griffin whether she gave her husband "blow jobs," K. Plaisance's remarks such as "I bet her pussy stinks" or "the dog was licking her pussy," and K. Plaisance asking B. Plaisance whether she shaved her "pussy." Third, many of the incidents described above qualify as humiliating, including K. Plaisance shouting across the store to ask Griffin whether she gave her husband "blow jobs." Moreover, K. Plaisance touching Terrebonne on her bottom could be construed as physically threatening because he continued to approach her after she told him to leave her alone. Finally, the harassment unreasonably interfered with plaintiffs' work performance. Several witnesses testified that Terrebonne and B. Plaisance frequently cried on the job, and that Griffin became withdrawn and cried on the job. Terrebonne testified that she cried constantly, frequently had severe headaches, stomach problems and nausea, and frequently felt tired and drained. B. Plaisance testified that she cried frequently and became very withdrawn. Griffin testified that she cried, felt angry, and tried to work harder. Thus, the evidence amply supports the existence of a hostile work environment at Delchamps.

15

The cases cited by Delchamps are distinguishable. See Webb v. Cardiothoracic Surgery Assocs., 139 F.3d 532, 538-39 (5th Cir. 1998) (affirming district court's grant of summary judgment motion because, inter alia, employer took prompt remedial action after learning of alleged harassment); Weller, 84 F.3d at 194-95 (finding that evidence that supervisor gave plaintiff an article about the "spirit of Jezebel" was insufficient for jury to find the existence of hostile work environment); DeAngelis v. El Paso Mun. Police Officers Assoc., 51 F.3d 591, 595-96 (5th Cir. 1995) (finding evidence insufficient to support jury verdict on existence of hostile work environment where harassment complained of consisted merely of a few written jibes about plaintiff and female police officers published in newsletter over period of two and one half years); Gleason v. Mesirow Financial, Inc., 118 F.3d 1134, 1137, 1144-45 (7th Cir. 1997) (affirming grant of summary judgment to employer where, inter alia, supervisor flirted with plaintiff's female relatives, stated that female customers were "bitchy," "dumb," or suffering from "PMS," told another employee that he liked her in tighter skirts, stood on his desk to "ogle" women as they walked by, informed plaintiff that he had spent weekend at nudist colony, and told plaintiff that he had dreamt about holding hands with her); Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir. 1995) (finding nine incidents over seven month period insufficient to support jury verdict on existence of hostile work environment where, inter alia, supervisor called plaintiff "pretty girl," made grunting sounds

16

one time plaintiff wore a leather skirt, implied that plaintiff raised the temperature of his office because she was attractive, stated that he had left a party early because he did not want to lose control around the "pretty girls," and made a gesture indicating masturbation); Saxton v. American Tel. & Tel. Co., 10 F.3d 526, 528, 534 (7th Cir. 1993) (affirming grant of summary judgment to employer where supervisor touched plaintiff on leg while at jazz club, kissed her briefly later that evening, and "lurched" at her from behind bushes while out on a walk during lunch); Weiss v. Coca-Cola Bottling Co., 990 F.2d 333, 334-35, 337 (7th Cir. 1993) (affirming grant of summary judgment to employer where supervisor asked about plaintiff's personal life, complimented her, asked her for dates, jokingly called her "dumb blond," put his arm around her and tried to kiss her while at a bar, placed "I love you signs" in her work area, put his hand on her shoulder at least six times, and tried to kiss her twice); Scott v. Sears, Roebuck & Co., 798 F.2d 210, 211-12, 213-14 (7th Cir. 1986) (affirming grant of summary judgment motion to employer where supervisor asked plaintiff out on dates, winked at her, suggested that he give her a "rub-down," and asked what he would receive from her in exchange for requested advice or assistance, and where co-worker slapped her buttocks, and another co-worker stated that she must moan and groan while having sex).[9]

---

[9] We note that the standard applied in Scott required that, before the conduct complained of was actionable, it had to "cause such anxiety and debilitation to the plaintiff that working conditions were poisoned." Id. at 213 (internal quotation marks omitted). The Seventh Circuit later noted that this standard was

17

The incidents to which plaintiffs testified are significantly more severe and pervasive than those alleged in the above cases.

Delchamps argues in its reply brief that a recent Fifth Circuit case requires us to find that a hostile work environment did not exist at Delchamps. See Butler v. Yselta Indep. Sch. Dist., 161 F.3d 263 (5th Cir. 1998). We find this case distinguishable. In Butler, we found that a series of anonymous letters mailed to plaintiffs at their homes by the principal of the school where plaintiffs worked did not constitute severe or pervasive harassment.[10] See id. at 269. In finding that a hostile work environment did not exist, we relied on the fact that the letters were received at home, were sent infrequently over the time period, and were non-threatening. See id. at 269-70. The facts of Butler are clearly distinguishable from the facts of the instant case.

Delchamps argues, however, that after Butler, we are required to consider a fifth factor, in addition to the factors outlined in Harris, in determining whether a hostile work environment existed. Supreme Court precedent establishes that, while we must consider "all the circumstances," not every listed

---

overruled by Harris v. Forklift Sys., Inc., 510 U.S. 17 (1993), which held that plaintiffs need not prove psychological injury in order to establish actionable harassment. See Saxton v. American Tel. & Tel. Co., 10 F.3d 526, 533 (7th Cir. 1993).

[10] The letters included statements such as "You are still trying to control everyone's life," "You probably could use a man in your life to calm some of that frustration down," "When you drive down the street you look like you're pissed off," and "When are you going to start dressing like an adult." Id. at 265.

18

factor need be present in order for a work environment to qualify as sufficiently hostile or abusive. Harris, 510 U.S. at 23 ("But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.").[11] Nevertheless, consideration of the additional factor described in Butler does not help Delchamps's case. In Butler, we suggested that it could be relevant to consider whether the conduct complained of explicitly or implicitly has the purpose or effect of undermining the plaintiffs' workplace competence so as to create more disadvantageous terms or conditions for the plaintiffs because of their sex than for members of the opposite sex. See 161 F.3d at 270. Implicit in the behavior directed at plaintiffs--including, but not limited to, the frequent comments about oral sex, K. Plaisance's daily statements that he wanted to "come" on and "fuck" Terrebonne, and K. Plaisance's frequent grabbing his crotch and telling Terrebonne to "suck this"--is the message that women are not welcome in the workplace because of their sex, and that women are not valuable as workers but are only good for gratifying men sexually. This undermines the

---

[11] It is further evident that the Supreme Court did not intend to require that every factor listed be present before a work environment qualifies as hostile or abusive because its list included both the severity and the pervasiveness of the discriminatory conduct as relevant factors to consider when evaluating whether an environment is hostile or abusive. See Harris, 510 U.S. at 23 ("These [factors] may include the frequency of the discriminatory conduct [i.e., its pervasiveness]; [and] its severity . . . .") (emphasis added). Yet, as the Supreme Court has stated, for sexual harassment to be actionable it need only be "'sufficiently severe or pervasive.'" Id. at 21 (quoting Meritor Sav. Bank, 477 U.S. at 67)) (emphasis added); see Faragher, 118 S. Ct. at 2283.

workplace competence of women subjected to such behavior, and creates less advantageous terms or conditions of employment for them, "impairing their ability to compete on an equal basis with men." Id. at 270 (quoting DeAngelis, 51 F.3d at 593). As we noted in Butler, the "critical issue" in determining whether an actionably hostile or abusive work environment exists is whether plaintiffs were subject to "'disadvantageous terms or conditions of employment to which member of the other sex [were] not exposed.'" Id. at 271 (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 118 S. Ct. 998, 998 (1998)). It is clear that here plaintiffs were subject to such terms or conditions, and we therefore hold that the evidence is sufficient to support the jury's finding that an actionable hostile work environment existed at Delchamps.

## B.  Employer Liability

Delchamps urges us to find that it is not liable for the hostile environment that existed at its Cut Off, Louisiana store. It argues that plaintiffs did not prove that the harassment complained of was committed by a supervisor, and that therefore it cannot be vicariously liable under the principles articulated in the Supreme Court's recent decisions in Faragher v. City of Boca Raton, 118 S. Ct. 2275 (1998), and Burlington Industries, Inc. v. Ellerth, 118 S. Ct. 2257 (1998). While conceding that store manager Berthelot qualifies as a supervisor, Delchamps contends that K. Plaisance, who it argues was not a supervisor, and other non-supervisory personnel, perpetrated the vast

20

majority of the complained of harassment. Plaintiffs respond by arguing that K. Plaisance qualifies as a supervisor or, alternatively, that Berthelot was responsible for the hostile work environment, mandating further inquiry under <u>Faragher</u> and <u>Burlington Industries</u>.

We need not decide whether supervisors created the hostile work environment at Delchamps, however, because we find that the evidence was sufficient to support the conclusion that Delchamps knew or should have known of the harassment experienced by plaintiffs and failed to take prompt remedial action. As an alternative to vicarious liability, an employer may be held responsible for a hostile work environment "if it knew or should have known of the harassment and failed to take prompt remedial action." <u>Nash v. Electrospace Sys., Inc.</u>, 9 F.3d 401, 404 (5th Cir. 1993) (citing <u>Jones</u>, 793 F.2d at 720); <u>see Burlington Indus.</u>, 118 S. Ct. at 2267 ("An employer is negligent with respect to sexual harassment if it knew or should have known about the conduct and failed to stop it. Negligence sets a minimum standard for employer liability under Title VII."). A plaintiff may establish an employer's knowledge by demonstrating either actual or constructive notice to the employer. <u>See Sharp v. City of Houston</u>, No. 97-20602, 1999 WL 10153, at *4 (5th Cir. Jan. 12, 1999); <u>Williamson v. City of Houston</u>, 148 F.3d 462, 465 (5th Cir. 1998); <u>Waltman v. International Paper Co.</u>, 875 F.2d 468, 478 (5th Cir. 1989). Actual notice can be proven by evidence that the plaintiff

21

complained to someone in management with the authority to take remedial action, see Sharp, 1999 WL 10153, at *4-*5; Waltman, 875 F.2d at 478, whereas constructive notice is demonstrated by showing that the harassment was sufficiently pervasive to give "rise to the inference of knowledge or constructive knowledge" on the part of someone with remedial authority, Waltman, 875 F.2d at 478 (internal quotation marks omitted); see Sharp, 1999 WL 10153, at *5.

The evidence is sufficient to hold Delchamps liable under both actual and constructive notice theories. B. Plaisance testified that she complained to assistant manager Hebert in late 1994 or early 1995 about the chrome shots and the male employees following around females, and that she reported to both Hebert and store manager Berthelot in early 1995 that assistant manager Kirchhoff had walked into the restroom while she was partially undressed. None of these complaints resulted in a response. She further testified that in May 1995 she informed Berthelot that she did not want him to show her magazines with sexual content. He replied that she had an "attitude problem" and should try to "have fun with it." All three plaintiffs met with Berthelot in mid-June 1995 to discuss their grievances. At the meeting, they brought to Berthelot's attention that K. Plaisance had touched Terrebonne's bottom and they complained of K. Plaisance's vulgarity. Berthelot's response was to pretend that he was playing the violin in mock sympathy. He took no corrective action. Plaintiffs testified that the offensive behavior

22

worsened after the meeting and that the atmosphere became more hostile. Ultimately, plaintiffs met with area supervisor Smith to air their grievances.[12] Plaintiffs testified that the atmosphere deteriorated further after these meetings.

Delchamps's sexual harassment policy provides that

[i]f any associate feels he or she is the victim of unlawful discrimination, the associate should feel free to discuss the matter with his or her supervisor. If the circumstances are such that the associate would prefer to discuss this matter with someone else other tha[n] his or her immediate supervisor, the associate may contact . . . anyone else he or she may prefer within the Company. We will see that the matter will be promptly investigated and handled appropriately.

As we noted in Williamson, "[w]hen an organization designates a particular person or persons to receive harassment complaints, it sends a clear signal that those persons have the authority to accept notice of harassment problems." 148 F.3d at 466. Here, the evidence demonstrates that plaintiffs reported the harassment to their supervisors, as instructed by Delchamps's sexual harassment policy. This actual notice can be imputed to Delchamps for purposes of liability. See id. at 467.

Moreover, Berthelot, as store manager, undeniably had authority to take corrective action and knew or should have known about the harassment taking place at the store. The evidence indicates that Berthelot himself participated in much of the harassing behavior complained of by plaintiffs, and that the

---

[12] Smith did issue K. Plaisance a written reprimand as a result of these meetings, but the reprimand referred only to off-color jokes and innuendos and not to the incident in which K. Plaisance inappropriately touched Terrebonne.

conduct was sufficiently severe and pervasive that he either was aware or should have been aware of its existence. Thus, Delchamps had constructive knowledge of the situation.

Additionally, despite the complaints, Delchamps "failed to take steps to repudiate th[e] conduct and eliminate the hostile environment." Farpella-Crosby, 97 F.3d at 807; see Nash, 9 F.3d at 404. The vast majority of plaintiffs' complaints were ignored, or, worse, mocked. We conclude that the evidence is sufficient to support the jury's verdict that Delchamps is liable for the hostile environment that existed at its Cut Off, Louisiana store.

### C. Constructive Discharge

Delchamps argues that the evidence does not support the jury's finding that the plaintiffs were constructively discharged from their employment with Delchamps, and that therefore we should reverse the back and front pay awards plaintiffs received. A claim for constructive discharge requires a plaintiff to prove that the employer deliberately made the "employee's working conditions so intolerable that the employee [wa]s forced into an involuntary resignation." Dornhecker v. Malibu Grand Prix Corp., 828 F.2d 307, 310 (5th Cir. 1987). This requires a showing that "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." Landgraf v. USI Film Prods., 968 F.2d 427, 429 (5th Cir. 1992) (internal quotation marks omitted), aff'd 511 U.S. 244 (1994); see Dornhecker, 928 F.2d at 310. To prove

24

constructive discharge in the sexual harassment context, "the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." Landgraf, 968 F.2d at 430.

Viewing the evidence in the light most favorable to the jury's verdict, as we must, we conclude that the harassment described above is more than sufficient to support the jury's finding that plaintiffs were constructively discharged. Plaintiffs experienced severe and degrading harassment at the hands of their male co-workers. They made numerous complaints to their supervisors over a period of several months, which were ignored. They testified that after each complaint the offensive behavior continued and the atmosphere of the store became more hostile. Ultimately, after complaining to area supervisor Smith, K. Plaisance received a written reprimand. Nevertheless, plaintiffs testified that the offensive behavior continued unabated, and that their male co-workers became even more hostile and violent.[13] Under these circumstances a reasonable person would have felt compelled to resign.

The cases cited by Delchamps are distinguishable. See Webb, 139 F.3d at 539-40 (affirming grant of summary judgment to employer on constructive discharge theory because employer took prompt remedial action, including requiring harasser to end his offensive conduct and offering to transfer employee away from

---

[13]  Terrebonne testified that Leger struck her with his meat cart after the complaint to Smith.

25

harasser); <u>McKethan v. Texas Farm Bureau</u>, 996 F.2d 734, 740-41 (5th Cir. 1993) (upholding district court's directed verdict on age discrimination claim, finding no constructive discharge where plaintiff endured two minutes of embarrassing remarks at awards dinner, but voluntarily delayed his retirement for thirteen months for tax purposes and later requested his job back); <u>Ugalde v. W.A. McKenzie Asphalt Co.</u>, 990 F.2d 239, 243 (5th Cir. 1993) (affirming grant of summary judgment to employer, concluding reasonable employee would not have felt compelled to resign where plaintiff contended that supervisor subjected him to ethnic slurs, but did not mention the slurs on the one occasion he attempted to complain, after which he walked off the job); <u>Landgraf</u>, 968 F.2d at 429-30 (concluding evidence supported district court's finding that plaintiff was not constructively discharged where district court found that plaintiff's reason for resigning was not complained of sexual harassment, and evidence supported district court's conclusion that employer took reasonable steps to end harassment); <u>Dornhecker</u>, 828 F.2d at 310 (holding that, because employer took prompt remedial action, district court clearly erred in finding plaintiff was constructively discharged, where plaintiff, who had been employed with defendant for two days, was sexually harassed on business trip, complained to her supervisor, but quit despite employer's promise that she would not have to work with harasser after business trip ended two days later); <u>Larry v. North Miss. Med. Ctr.</u>, 940 F. Supp. 960, 966 (N.D. Miss. 1996) (dismissing

plaintiff's constructive discharge claim where employer took prompt remedial action and no further incidents occurred prior to plaintiff's resignation), aff'd in part sub nom. Larry v. Grice, 156 F.3d 181 (5th Cir. 1998) (unpublished table decision); Sims v. Brown & Root Indus. Servs., Inc., 889 F. Supp. 920, 931 (W.D. La. 1995) (granting summary judgment on constructive discharge claim where plaintiff resigned only because she felt "awkward" with two co-workers after employer terminated harasser), aff'd, 78 F.3d 581 (5th Cir. 1996) (unpublished table decision). We find that there is ample evidence to support the jury's conclusion that a reasonable person in the shoes of plaintiffs would have felt compelled to resign.

## D. Intentional Infliction of Emotional Distress

Delchamps requests that we overturn the district court judgment with respect to the awards for intentional infliction of emotional distress, arguing that it is not vicariously liable for the acts of its employees. In determining whether Delchamps may be found vicariously liable under Louisiana law for the intentional infliction of emotional distress committed by its employees, courts consider whether the acts complained of were committed on the employer's premises, whether the acts were committed during hours of employment, whether the acts were primarily employment rooted, and whether the acts were reasonably incidental to the performance of the employee's duties. See Baumeister v. Plunkett, 673 So.2d 994, 996-97 (La. 1996). While the conduct underlying plaintiffs' claims for intentional

27

infliction of emotional distress did occur on Delchamps's premises during working hours, satisfying the first two elements, the acts complained of were not primarily employment rooted, nor were they reasonably incidental to the performance of the duties of Delchamps's employees.

While the predominant motive of the employee need not be employment related in order for the acts to be deemed primarily employment rooted, the purpose of serving the employer must actuate the employee at least to some extent. See id. at 999-1000 ("If the purpose of serving the master's business actuates the servant to any appreciable extent, the master is subject to liability if the act is otherwise within the service. . . . In our case, serving the master's business did not actuate the servant at all, much less to any appreciable extent.") (internal quotation marks and citation omitted). The evidence put forth by plaintiffs does not support the conclusion that the purpose of serving Delchamps constituted any part of the motivation for committing the acts forming the basis of their claims of intentional infliction of emotional distress. Instead, these acts were "entirely extraneous" to Delchamps's interests. See id. at 1000. Moreover, the acts complained of were not reasonably incidental to the performance of employment duties because the employees' responsibilities did not include any duties that would make such conduct reasonably foreseeable or fairly attributable to Delchamps. See id. at 999; Samuels v. Southern Baptist Hosp., 594 So.2d 571, 574 (La. Ct. App. 1992).

28

Viewing the evidence in the light most favorable to the jury's verdict, we cannot conclude that Delchamps is vicariously liable for the intentional torts of its employees, and therefore reverse the judgment as to plaintiffs' intentional infliction of emotional distress claims.[14]  Because we reach this result, we need not consider Delchamps's argument that the jury's award of both compensatory damages and damages for intentional infliction of emotional distress constituted a double damage award.

### E.  Compensatory Damages

Delchamps argues that the jury's compensatory damage awards were excessive and that plaintiffs were entitled only to nominal damages because they did not present sufficient proof of mental anguish.  Our review of this award is deferential to the conclusions of the fact-finder.  See Patterson v. P.H.P. Healthcare Corp., 90 F.3d 927, 937-38 (5th Cir. 1996).  Plaintiffs were required to establish the harm they suffered, either through corroborating testimony or medical or

---

[14]  Alternatively, we may uphold the district court judgment on plaintiffs' intentional infliction of emotional distress claims if Delchamps itself committed the tort, which would require a showing that Delchamps's conduct was extreme and outrageous, that the conduct caused plaintiffs to suffer severe emotional distress, and that Delchamps desired to cause severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from its conduct. See White v. Monsanto Co., 585 So.2d 1205, 1209 (La. 1991).  We conclude that Delchamps's behavior in failing to remedy the hostile environment created by its employees does not rise to the level of extreme and outrageous conduct necessary to support the judgment.  See id. ("The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.").

psychological evidence. See id. at 940. After a careful review of the record, we conclude that the jury's compensatory damage awards were well-supported by both plaintiffs' testimony and by corroborating testimony, and therefore we decline to overturn those awards.

## F. Punitive Damages

Punitive damages are appropriate where the complaining party shows "'that the respondent engaged in a discriminatory practice . . . with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" Patterson, 90 F.3d at 941 (quoting 42 U.S.C. § 1981a(b)(1)) (emphasis added). In Patterson, we stated that an employer could be liable for the malicious or reckless conduct of its employees if the employer itself (i.e., someone sufficiently high in company hierarchy) acted maliciously or recklessly, or if the employer knew or should have known of the malicious or reckless conduct, but took no action. See id. at 944 & n.15. However, in Deffenbaugh-Williams v. Wal-Mart Stores, Inc., 156 F.3d 581, 593 (5th Cir. 1998), vacated and reh'g en banc granted, No. 97-10685, 1999 WL 107104 (5th Cir. Feb. 26, 1999), we reexamined this holding in light of the Supreme Court's pronouncements in Faragher and Burlington Industries, and held that a supervisor's malicious or recklessly indifferent acts may be imputed to the employer for purposes of awarding punitive damages through principles of vicarious liability. Because the jury was instructed under the standards set forth in Patterson and because our opinion in

Deffenbaugh-Williams has been vacated, we will apply the law as it existed prior to Deffenbaugh-Williams.[15]

Under Patterson, an employer is not strictly liable for punitive damages for the acts of its agents, but may be liable for such damages under agency principles. See Patterson, 90 F.3d at 942. The Patterson court found that a project manager's discriminatory acts could not be imputed to the employer for purposes of punitive damages where the project manager was not sufficiently high in the company, and where there was no evidence that the company knew or should have known of his discriminatory acts.[16] See id. at 944 (finding that actions of supervisor alone, "without some evidence showing that [the employer] knew or

_____

[15] Specifically, the jury charge reads:

If you find Defendant Delchamps intentionally discriminated against Plaintiffs, the law allows you, but does not require you, to award punitive damages.

. . . .

In this case, you may award punitive damages if you find that Defendant Delchamps engaged in a discriminatory practice or practices with malice or reckless indifference to the rights of Plaintiffs to be free from such intentional discrimination in employment.

The verdict form reads:

Do you find from a preponderance of the evidence that Defendant's corporate management personnel acted with actual malice or gross negligence which evidences a willful, wanton or reckless disregard regarding [the plaintiffs'] claims that Delchamps subjected [them] to a hostile work environment.

[16] The employer had distributed a non-discrimination policy to its employees detailing complaint procedures, but neither plaintiff utilized the complaint procedures. See id.

31

should have known of [the supervisor's] malicious or reckless conduct, are insufficient to cause punitive liability to directly attach to [employer]").

We conclude that the punitive damage awards in this case were appropriate under Patterson. Berthelot, the store manager, and Smith, the area supervisor,[17] are managerial employees such that their malicious or recklessly indifferent behavior binds Delchamps for purposes of punitive damages. See EEOC v. Wal-Mart Stores Inc., 156 F.3d 989, 992 (9th Cir. 1998) (assistant manager's discriminatory behavior binds employer for purposes of punitive damages); Cline v. Wal-Mart Stores, Inc., 144 F.3d 294, 306 (4th Cir. 1998) (store manager's discriminatory behavior binds employer for purposes of punitive damages); EEOC v. Wal-Mart Stores, Inc., 11 F.Supp.2d 1313, 1322 (D.N.M. 1998) (assistant manager's and training coordinator's discriminatory behavior binds employer for purposes of punitive damages); Deters v. Equifax Credit Info. Servs., Inc., 981 F. Supp. 1381, 1384-85 (D. Kan. 1997) (behavior of general manager of local office binds employer for purposes of punitive damages); Preston v. Income Producing Management, Inc., 871 F. Supp. 411, 415 (D. Kan. 1994) (co-manager's behavior binds employer for purposes of punitive damages).

Viewing the evidence in the light most favorable to the jury's verdict, we conclude that there was sufficient evidence from which the jury could conclude that Berthelot and/or Smith

---

[17] Smith had authority over sixteen stores.

32

acted with malice or reckless disregard for the rights of plaintiffs to be free from sexual harassment. Berthelot personally contributed to the revolting atmosphere of sexual harassment described above, ignored every complaint brought to his attention, responded by pretending to play the violin in a gesture of mock sympathy or by rolling his eyes, and, when informed by B. Plaisance that she did not like him showing her magazines with sexual content, responded that she had an "attitude problem" and that she should just laugh and "have fun with it." Meanwhile, the harassing behavior continued and the hostile atmosphere worsened.

Smith's behavior also evinced malice or reckless indifference to the rights of plaintiffs to be free of sexual harassment. When plaintiffs brought their complaints to his attention, he appeared to accept the word of store manager Berthelot at face value after Berthelot denied one of B. Plaisance's complaints, issued a written reprimand that did not address the plaintiffs' principal complaint (K. Plaisance's inappropriate touching of Terrebonne),[18] looked at Terrebonne as

_____

[18] The reprimand referred to off-color jokes and innuendos, despite the fact that Smith testified that none of the plaintiffs had complained to him about K. Plaisance's vulgarity and had only complained about K. Plaisance's inappropriate touching of Terrebonne. The jury was free to be skeptical of Smith's testimony that he decided to issue K. Plaisance a reprimand for behavior that Smith claimed nobody had complained about, but not to issue a reprimand for behavior that Smith testified plaintiffs brought to his attention. The jury was free to disbelieve his testimony that none of the plaintiffs had informed him about K. Plaisance's vulgarity. Moreover, the jury was free to conclude that Smith did not adequately handle plaintiffs' complaints because of malice or reckless indifference.

if he did not believe her story after a subsequent complaint, and took no follow-up action after the written reprimand to ensure that the offensive conduct would not continue.[19]  As a result, the harassing behavior did continue, and the hostility at the store worsened to the point that plaintiffs were compelled to resign.[20]

Thus, there was sufficient evidence from which the jury could conclude that Delchamps engaged in a discriminatory practice with malice or reckless indifference to plaintiffs' rights to be free from discrimination.  We therefore decline to overturn the punitive damage awards.

### G.  Improper Jury Instruction

---

[19]  In fact, Smith testified that, despite the language of the written reprimand that he issued K. Plaisance, which read "[a]ny further action of this [sort] will result in termination," he took no corrective action in response to Griffin's later complaint, which K. Plaisance denied, that K. Plaisance had asked her whether she performed oral sex on her husband.  The jury was free to conclude from this testimony that Smith's behavior indicated malice or reckless indifference to the rights of plaintiffs to be free from sexual harassment.

[20]  Smith further testified at trial that Terrebonne had told him that she considered K. Plaisance's touch to be merely a friendly pat, that Terrebonne signed a statement to that effect at the time of Smith's investigation, and that Smith had been unable to verify plaintiffs' other complaints.  Yet, Smith could not produce the statement that Terrebonne allegedly had signed, nor the notes he claimed to have taken during the meetings, and Terrebonne denied his version of events.  Thus, the jury was free to disbelieve Smith's testimony, and to infer that he concocted the story to cover up his poor response, demonstrating malice or reckless indifference.  See EEOC v. Wal-Mart Stores Inc., 156 F.3d 989, 993 (9th Cir. 1998) (concluding jury should have been allowed to decide appropriateness of punitive damages where evidence demonstrated that assistant manager attempted to cover up discriminatory conduct by, inter alia, fabricating an interview that never transpired).

34

Delchamps contends that the district court improperly instructed the jury on corporate liability. It argues that the jury charge could have led the jury to believe that Delchamps was strictly liable for its employees' conduct.[21] For a challenge to a jury charge to succeed, the party challenging the charge must demonstrate that "the charge as a whole creates substantial and ineradicable doubt whether the jury has been properly guided in its deliberations." Federal Deposit Ins. Corp. v. Mijalis, 15 F.3d 1314, 1318 (5th Cir. 1994) (internal quotation marks omitted). Delchamps has not met this standard because the jury charge, read as a whole, properly instructed the jury that demonstrating Delchamps's liability for its employees' acts of sexual harassment requires proof "that the employer knew or should have known of the harassment and failed to take prompt remedial action."[22] We conclude that there is no doubt that the jury was properly guided in its deliberations.

## H. Admission of Deposition Testimony

Finally, after consideration of the arguments set forth in the parties' briefs, we conclude that the district court properly

---

[21] The challenged jury charge reads:

A corporation under the law is a person, but can only act through its employees, agents, directors or officers. The law, therefore, holds a corporation responsible for the acts of its employees, agents, directors, and officers.

[22] The jury instruction also properly instructed the jury on the requirements for employer liability for its employees' acts of intentional infliction of emotional distress. However, this instruction is irrelevant in light of our resolution of plaintiffs' claims for intentional infliction of emotional distress.

admitted the deposition testimony of Amy Landry.  We agree with the district court that plaintiffs sufficiently demonstrated the unavailability of the witness and that the witness's testimony was relevant.

## IV.  CONCLUSION

For the foregoing reasons, we AFFIRM in part and REVERSE in part the judgment of the district court, and remand for entry of an amended judgment that vacates the awards for intentional infliction of emotional distress.  Delchamps shall bear the costs of this appeal.